Mr. Johnson, may it please the court, my name is Dan Johnson, counsel for Jairo Ramos. This is a case about prison officials who were trained to know about a risk, but who disregarded that risk, with the result being that my client was raped. Your client what? My what? Your client was what? Raped. Raped. Raped. Raped. Yeah. Yes. This court should reverse the grant of summary judgment and instead hold that a reasonable jury could find in favor of Ramos for two reasons. First, the defendants, particularly Warden Pugh and Deputy Warden Conziani, created a substantial risk, a significant harm, because they maintained a policy of random double cell assignments that placed prisoners at a heightened risk of being, yes. What's the alternative, what alternative would you suggest to random assignment? I would suggest that they have to, you know, at least, you know, consider whether. I mean, whether they have to ask everybody, are you a homosexual? No. No. All they would have to do is act on their existing knowledge. Well, what existing knowledge did they have of Ramos as being a homosexual or bisexual? So according to Ramos' affidavit, the prison staff believed that he was gay. Wait, how did that, where did that come up? But he never, he never, he never told them he was gay. This is what happened. I mean, so. This is what happened. The prison officials repeatedly asked if he was gay. They asked other, they asked other prisoners to confirm that he was gay, and they stated their belief that he was gay. He didn't want to come out because he was a, sorry. Did they ask him? Yes, they asked Ramos to confirm that he was gay. He didn't answer. Because he was afraid of becoming a target. That's exactly the point. Well, what are they supposed to do with him? If they state that they believe. Select a bunch of homosexuals and have them room together? If they. Homosexuals each get their own cell or? In the hypothetical world where we had a decent policy here. I don't want a hypothetical world, I want the real world. Right. Well, look. This is, this is what. If they hit a policy. What principle do you want? Do, does a prison, when someone is, you know, comes to the prison, do they have to conduct a, some kind of examination? No. To figure out whether this person is homosexual? No, no. What do they do? They just, if they, if they believe as they say that he's gay, then they should act in accordance with that belief. And what is, what does act in accordance mean? They should not assign people at a heightened risk of being raped with convicted rapists. Well, pardon, but anybody else is okay? It's just the convicted rapists? They can stick the homosexual in with heterosexuals? Yes. I mean, if, if, I mean, the point here is that you can't create, you're putting together two people that are very likely, that are a toxic combination. But that, but the rape was a, that was a sexual assault on a woman, right? Yes. The Silva? But it's, but it's well known that, you know, heterosexual rapists also rape men. You know, this was likely part of defended organs. No, that's not what's well known. What's well known is that you have a lot of, of homosexual activity in prison, but most of the people engaged in that activity are not homosexuals. They're just, you know, this is an inferior alternative for them. That's all they have. So you look for the sort of weak, skinny, you know, prisoners. So I don't get from your brief, what, what is a, what is a, what kind of policy is a prison supposed to have? You know, I mean, if you look at the logic of it, is that every prisoner should have his own cell. No, no. Which would be fine, but you know, we don't have that. No, if you look at the order in Jensen, this is, this is what the injunction said. The injunction poses upon the defendants a duty to use the classification instruments available to them to try to predict whether incoming inmates and their cellmates will be compatible. That's, that's basically it. Yeah, but DeSilvo, is that named DeSilva? Yeah. Oh yeah, that's the, that's the. He didn't, he didn't have any record, he spent some serious time in prison and there was, he had several faults, but none had anything to do with rape or irritating with homosexuals or anything else. But, but he did have a rape conviction. Yeah, way back before, when he wasn't in prison. And I, I would, well, I would respectfully submit that the, you know, conviction itself is sufficient. Well, there's a lot of, what people do before they get to prison have a lot of variables and this has been, as Judge Posner has asked, what's the alternative between random assignment? I assume they discern certain things. You don't put a bully in with somebody who's a weakling or something. I don't really know. But prison's not a pleasant place and I'm not sure who you want for a roommate. And I, I have to stress here, I have to stress here that we're, I'm not asking for perfection. I'm asking for at least that they try. Here the policy was that, apparently, was that they didn't even have to try. The policy was randomness. But what did you try? Yeah, yeah, because they asked around and tried to discern. And of course you want to ask the person before you make that kind of judgment or categorize him in that way. You know, you would be here if people made all those presumptions in the prison. I could see complaining because someone was presumed to be a homosexual because they had certain behaviors or people said they were and then we'd have that kind of case. Right? Well, I mean, I guess what it is, can you rephrase your question? I apologize. Well, the point is, he didn't admit it himself. I understand you said there were indicators from different people that spoke about it. Right. And you're saying, you know, well, he didn't want to say anything, just he was, he didn't respond when they asked him. So I'm just trying to figure out what kind of guidance we should give or you would give to the prison system. You know, without, you confronted the person after you gathered this, done a little investigation and then the person doesn't confirm it or doesn't deny it. I would say this, that you should let prisoners know that, you know, if you're at a heightened risk for victimization, such as being LGBTI, you know, that, you know, you should say to the prisons that, you should say to the prisoners that, you know, yes, that's a factor that we take into consideration. So you're saying as part of the orientation when you come into the jail, this subject should be raised so people understand. I mean, yeah, but I mean, the basic point here. But then you're going to have everybody saying I'm a homosexual so that they can have their own cell. No, not your own cell, not your own, not their own cell. How are you going to get around that? It's double selling is fine. Double selling with what? If you're a homosexual and you're afraid of being raped and so on, do you still have to be stuck in with a heterosexual or they have to find some little skinny heterosexual who's harmless or something like that or sterile or, you know. I mean, you know, the point here is that Ramos didn't come out. You answered my question. I apologize. People come into jail, they're put in prison. Now, what are you going to do? You have an interview with them and they say they're homosexual. They're afraid to be in a cell with another person. No, no, no, no. You don't need an interview. So what is it that the person is going to do? If they believe that someone is gay, then they shouldn't place him at a heightened risk of victimization. That's it. They don't need to even interview them. I mean, frankly, I... So you're saying they don't even need to talk to him. They can just look at, they can just do sort of their investigation, what people say and what they observe. And that's enough. Yes. As Judge Mannion said, the fact that De Silva had raped a woman not necessarily suggests that he was going to rape a man. Also, a lot of this rape in prison has to do with establishing domination over other prisoners, showing you're a tough guy, so that it's done by heterosexuals more than by homosexuals. Right. How are you going to deal with that? Well, I mean, if they know, if the person knows that they, that someone convicted, that someone did, you know, did a rape and that suggests that they're at a high... So what do you have, a separate wing for the rapist? No, no, no, no. What do you do with the rapist? Does he get his own cell? No, no. Well, does he get a cell with another rapist or what? You just don't put them... Well, how do you pick his cellmate? You don't put them with someone... Answer my question. How do you decide who his cellmate is going to be? You decide who their cellmate is going to be by picking someone who is not at a heightened risk of being raped. So let me ask you this. So which persons with sexual offenses can't be placed with vulnerable persons? Are you saying that anybody with any kind of prior sexual offense, no matter how long ago it was, or the type of conduct was involved, should be not placed, a vulnerable person should not be placed with them? I'm trying to see where we can draw the line. Or, you know, sometimes prisoners have convictions for assault, serious assault, you know, that is not related to sex. So is it your position that a 1983 claim should succeed if these prisoners were placed with vulnerable persons? No, I would say this is, you know, all I can say is just based on... I can't, you know, I can just argue on the basis of these facts, where this prisoner was in jail on a conviction for rape, De Silva was in jail on a conviction for rape. Now, you know... But you haven't explained what the prisoner is supposed to do with someone like that. Give him his own cell or what? No. Well, if he doesn't give him his own cell, why doesn't that invite exactly the problem we have in this case? Because you just think for a second, okay, do these prisoners, well, putting together these prisoners create a toxic combination where we're going to get a rape, and that's it. It literally takes a second. You look at this person's conviction, you look at this person's conviction, does this make sense? Or, you know... Men who rape women do not rape other men. You know, the vast majority of prison rapes, you know, look, a lot of... The vast majority of prison rapes are by, you know, heterosexuals. Well, there are no... Oh, they're all men in the prison. Right, right. So there's not going to be an intersex. And the other thing we keep getting back to is that this person, as he interviewed it, is he said, there's all kinds of guys hitting on me or something? Does he have to... I mean, when a prison person says, are you homosexual, it may be a precautionary thing. If someone says yes, then they're going to put it, maybe put him somewhere, as Judge Posner is pointing out, okay, now we know we got a guy who is homosexual, and I don't know, there may be rules what you do with that. I don't know what they are. But he doesn't acknowledge it. And there's this perception, that's pretty shallow, actually. Somebody's perceived. Well, you can perceive a whole lot of things, just people walking down the street. They believe that he was gay, you know, in conclusion, I'm going to save the rest for a rebuttal. Just by asking, they say they think he is? Yes, they believe that he was gay. No, they believe it's possible someone might think he is, and then he doesn't acknowledge it. He doesn't say, no, yeah, I got to be separate. No, he doesn't say anything, for whatever reason. How did he manifest himself as homosexual? Why do they think he was homosexual? I don't know, it's not in the record, but what they said is that they believed that he was gay. It should be in the record, why they thought that. You know, I, look, I was not the trial attorney here, but I mean, you know. How tall is this fellow? Five foot six. And he's skinny, five foot six, basically. I'd like to reserve the rest of my time for rebuttal. Okay, that's fine. Thank you very much. Thank you. Mr. Karp? Or Johnson Karp? Little confusing, a Johnson and a Johnson Karp. Johnson Karp. Good morning, your honors. Your honors, may it please the court, Assistant Attorney General Gabe Johnson Karp for the appellees here. Your honors, the rule that Mr. Ramos seeks here would require prison officials, regardless of the conditions at their institution, to implement a broad protective policy targeted at an indeterminate group of perceived vulnerable inmates, and intended to protect them against a group of all sexual offenders who are ever convicted of any sexual offense. This would be a broad departure from existing Eighth Amendment jurisprudence. Because Mr. Ramos is unable to satisfy either the objective or the subjective prongs under existing Eighth Amendment jurisprudence, appellees would ask that this court affirm the judgment below. Is there any standard as to how prisoners are segregated or integrated with each other? There is, your honor. Within DOC, there are, broadly speaking, three levels of consideration given to the type of harm that Mr. Ramos suffered here. The most broad consideration is the classification made at DOC Central, which is made by the Bureau of Classification and Movement, where when an individual comes in, the classification specialist looks at a number of criteria. I believe it's 14, and these are listed in Wisconsin Admin Code, DOC 30207. These include the offense of conviction, the attitude of the offender, criminal history. It also includes the offender's perceived vulnerability that the specialist understands through this interview. And these specialists have had training on sexual offenses in prison, and they acknowledge, don't they, that LGBT people are at an increased risk of sexual assault when they're doing this classification? Your honor, I can't speak specifically to the classification specialists, but DOC has made a concerted effort to implement PREA. And what we hear from Mr. Ramos himself is that there has been broad training on PREA, and that there have been numerous trainings throughout DOC, and this is a priority to inform everybody from the top down that preventing prison rape is a significant concern. Is this something that the classification people have to look at? Yes, your honor. PREA establishes a zero-tolerance policy from the top to the bottom. I know we've had a case in the past where someone will request that he be put in solitary because he feels endangered by the other prisoners. Isn't that an option? Or highly vulnerable? You know, someone, maybe he had cooperated with the police or something, so he's extremely unpopular in prison, and he has to be isolated. The record doesn't demonstrate what the policy is DOC-wide, but we know that at Stanley Institution, Stanley Correctional, where the events in this case took place, there is a specific wing or a unit that is largely for individuals with mental health issues, but Warden Pugh in his deposition testified that individuals who are vulnerable can also go to Unit 1. Child molesters, for example, they are not popular in prison. Potentially. No, they're not popular, the word gets around, and of course that's the one who might ask for isolation. Now, it's not, you're not part of the general population, you don't get to watch TV, you don't have a lot of other things, for fear of some being attacked. Now this guy, skinny and 5'6", according to him, I don't know, is there some size measure which somebody's going to put as a cellmate? I assume he gets the top bunk. Your Honor, I make two points from your comment there. With regard to size, I don't think that any court has ever established sort of a benchmark for height and weight that, you know, once you hit this, you're vulnerable and you satisfy the objective problem. Or age, a very young person. Well, and that points up another problem with Mr. Ramos' position, is that the class of individuals who would fall within this vulnerable category isn't limited to sexual orientation. If you look at the testimony from PREA Director Morgan, that's cited in our brief, that category of vulnerable people includes the young, it includes the old, it includes, based on sexual orientation, it also includes individuals with mental health issues. And I think it's generally understood that there's a large proportion of prison population that has mental health issues. And there was nothing in terms of Ramos, he had served 12 years before in prison, correct? That's correct, Your Honor. And there was nothing in his record that indicated that he had had problems during those years, in terms of being attacked or assaulted or things like that. That's correct. It would be a buzzword for vulnerability. That's correct, Your Honor, and somewhat to the contrary is that Mr. Ramos had, you know, some aggressive conduct in his conduct reports. So it's not that he was this sheepish, totally vulnerable individual, there's really nothing in the record to indicate that he was as vulnerable as his argument suggests now. So just going back to the levels of consideration that are available within DOC, once an individual is classified based on those criteria, there's also a unit, or rather an institution determination that decides where the individual is going to be placed within the institution. And then, sort of most importantly, we have the boots on the ground, the correctional officers who interact with these individuals on a daily basis and have training on how to avoid dangerous cell pairings and really have, you know, not only an institutional interest but a self-interest in eliminating potentially risky pairings. The correctional officers are going to do what they can to keep peace on their wing. And here, there's simply no evidence in the record that correctional officers disregarded anything in Mr. Ramos's or in Mr. DaSilva's file, which they had available to them. Your Honors, I would just briefly distinguish the Taylor and Jensen cases on which Mr. Ramos relied. Those cases involved instances where the vulnerability was clear on the record, that the wardens in those cases acknowledged the vulnerability of the inmates, and the wardens acknowledged the problems within their policies. Here, there's simply nothing in the record showing vulnerability and nothing in the record showing the awareness that individual or that wardens would have to have for Eighth Amendment liability. Finally, for putting all else aside, Your Honors, the defendants here would be entitled to qualified immunity. There's simply no clearly established law requiring implementation of such a broad policy as Mr. Ramos seeks. And unless Your Honors have any further questions, I would conclude by asking that this Court affirm the judgment below. Okay. Thank you, Mr. Johnson. Thank you. Mr. Johnson? So, this critical problem here is that the trainings haven't, what they're saying in the trainings hasn't been linked to anything that they're actually doing on the ground. The trainings say that LGBTIs are at a heightened risk of victimization, but you know what? They're not carrying out that in any way, evidently, with the actual policy on the ground. But you haven't suggested any feasible way of dealing with this problem. The only way that this is the feasible way, if you believe that two people will create a significant risk of rape, then you shouldn't put them together. And they believe that he was gay. The problem is that the men who rape women do not normally rape other men. They're heterosexual. Now, they may do it, of course, but in a prison, especially. But how is the prison supposed to be able to predict that? They are, you know, rapists, rape is a dominance thing. And the fact that it's a dominance thing outside of prison with heterosexuals raping women, inside prison with, you know, raping men, if they're going to be raping- You don't know anything about that, how often heterosexual rapists rape other prisoners, right? Is there a literature on that, or are you just speculating? This is, you know, basically what the training was, in terms of it's about a dominance thing. So your bottom line, because your crucial word is belief. If the prison believes the person is LGBT, that's sort of the standard, with no real definition as to what belief is. Belief versus perception. And so, you know, what really bothers me about this is that it's okay for him to keep it private to himself, but I don't see how he can rely on his non-answers to those questions to try to show deliberate indifference on the part of the officials. If we have a policy in place that, you know, protected people, then you wouldn't be afraid of being a target if you came out. And that's, in closing, please reverse this order. Thank you very much, Your Honor. Okay, well thank you very much, Mr. Johnson.